IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY T., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO.   25-cv-1294 |
| | : | |
| FRANK BISIGNANO, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                    **September 30, 2025**

Plaintiff Gary T. brought this action seeking review of the Commissioner of Social Security Administration's decision denying his claim for Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 403-433, 1381-1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 6) is **GRANTED**, and the matter is remanded for further proceedings consistent with this memorandum.

## I.    PROCEDURAL HISTORY

This case is before me for the second time, after I remanded to the Administrative Law Judge (ALJ) based on errors related to the ALJ's treatment of certain medical opinions contained in the record.  *See G.T. v. Kijakazi*, No. 22-cv-3995, 2023 WL 5152306 (E.D. Pa. Aug. 10, 2023).  Plaintiff initially protectively filed for SSDI and SSI, alleging disability since January 1, 2019, due to mental illness, depression, anxiety, panic attacks, lumbar spondylosis, neuropathy in feet and hands, and kidney stones.  (R. 242, 258, 265).  Plaintiff's application was denied at the initial level and upon reconsideration, and Plaintiff requested a hearing before an ALJ.  (R. 48,

141-56).  Plaintiff, represented by counsel, and a vocational expert (VE) testified at an August 9, 2021, administrative hearing.  (R. 75-103).  On October 15, 2021, the ALJ issued a decision unfavorable to Plaintiff.  (R. 45-74).  Plaintiff appealed the ALJ's decision, but the Appeals Council denied Plaintiff's request for review on September 12, 2022, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (R. 1-7).

On October 6, 2022, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania alleging, among other things, that the ALJ erred in her treatment of the medical evidence in the record.  *G.T.*, 2023 WL 5152306, at *8.  I granted Plaintiff's request for review based on a determination that the ALJ erred in her treatment of certain medical evidence in the record,[1] and remanded the case to the ALJ for further proceedings.  *Id.* at *16; (R 1429-62).

The ALJ held a second administrative hearing on August 26, 2024, at which Plaintiff, represented by counsel, and a VE testified.  (R. 1332-59).  Subsequently, on August 28, 2024, Plaintiff amended his alleged onset date to September 1, 2020.  (R. 1585-86).  On November 13, 2024, the ALJ issued a decision unfavorable to Plaintiff.  (R. 1301-31).

On March 11, 2025, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania and consented to my jurisdiction pursuant to 28 U.S.C. § 636(C) five days later. (Compl., ECF No. 1; Consent Order, ECF No. 4).  On June 11, 2025, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 6). The Commissioner filed a Response on July 10, 2025, and on July 21, 2025, Plaintiff filed a Reply.  (Resp., ECF No. 7; Reply, ECF No. 8).

---

[1]  Specifically, in addressing Plaintiff's former argument that the ALJ erred in her treatment of the medical opinions of Helen Volokhonsky, M.D., Frank Balloqui, M.D., and David Dzurinko, M.D., I determined that "the ALJ's conclusion that the opinions of these three physicians 'appear' to be based primarily on subjective rather than objective evidence [wa]s, on its face, speculative and unsupported."  *G.T.*, 2023 WL 5152306, at *12.

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here

the evidence relevant to the instant request for review.

Plaintiff was born on September 5, 1970, and was 48 years old on the alleged disability

onset date. (R. 242). He completed two years of college. (R. 259). Plaintiff previously worked

as a manager at a night club. (*Id.*).

### A.    Medical Evidence

#### 1.    Physical

Plaintiff has reported pain in his back and all four extremities since at least 2017. Plaintiff

underwent right- and left-sided radiofrequency ablations in October and November 2017 and was

"very pleased" with the results, reporting in an approximately 50 percent decrease in pain. (R.

542). At a February 2018 visit with Thomas Zavitsanos, M.D., his primary complaint was

idiopathic neuropathy of his hands and feet bilaterally with pain a four or five on a scale of 10.

(*Id.*). His physical examination results at the time were normal. (*Id.*). He was directed to

consult with a neurologist, but did not do so. (R. 538). In the fall of 2018 and early 2019, he

underwent lumbar facet joint diagnostic medial branch blocks, resulting in an 80 percent

decrease in pain, but the improvement was temporary. (R. 806, 809, 911-13). On December 5,

2018, he reported to Dr. Zavitsanos that he had attempted to return to work as security at a night

club. (R. 531). His physical examinations in this period remained generally unremarkable. (R.

502). He also underwent another radiofrequency ablation on February 14, 2019. (R. 520).

At a November 1, 2019, visit with his primary care physician, Helen Volokhonsky, M.D.,

Plaintiff indicated that he had an upcoming appointment with a rheumatologist due to fatigue,

joint pain and to "check inflammatory markers," but the record does not indicate that he kept the

appointment. (R. 506). His physical examination results during this period were essentially

unremarkable.  (R. 505, 509).  An MRI a few days later showed mild spondylosis, worse at LS-S1 with mild bilateral neural foraminal narrowing, but no significant posterior disc herniation, spinal canal stenosis, or narrowing elsewhere in the lumbar spinal column.  (R. 331-32).

Plaintiff's activities of daily living (ADLs) throughout the relevant period, as reported at his therapy sessions, included exercising several times per week, cycling, vacationing and going out to dinner with his wife, going to other social events, and caring for his elderly mother during the pandemic.  (R. 516, 666-67, 731, 1052, 1057, 1091, 1253, 1255, 1263).  At a December 2019 session, in particular, he reported "feeling good" physically.  (R. 648).

On December 30, 2019, Plaintiff was seen at Urological Associates Bucks in Langhorne, Pennsylvania, for recurrent abdominal pain and sepsis.  (R. 338).  Treatment notes indicate that Plaintiff had been hospitalized "several times for abdominal pain and sepsis partial small-bowel obstruction probably from his inflammatory bowel disease" and that he had been seen in the past for recurrent kidney stones.  (*Id.*).  A CAT scan at this time showed "a stable minimally complex cyst."  (*Id.*).  Physical examination results, including Plaintiff's gait, were unremarkable, as they were at a gastroenterologist visit and an emergency room visit (for acute sinusitis) in March 2020.  (R. 340, 351-52, 361).

At a telemedicine visit with Dr. Zavitisanos on May 14, 2020, Plaintiff reported that his pain had returned and that he was suffering from neuropathy affecting his feet and hands (eight on a scale of 10), although he had not followed up for pain management since his radiofrequency ablations in early 2019.  (R. 516).  He further reported constant low back pain, worsening with extension.  (*Id.*).

On June 18, 2020, Dr. Volokhonsky completed a Physical RFC Assessment wherein she found that Plaintiff could stand and walk for less than two hours and sit for two hours in an eight-hour workday and that he would have to alternate positions at will and take unscheduled

breaks. (R. 578). She determined that he could not tolerate any exposure to humidity or hazards, rarely tolerate exposure to extreme temperatures or respiratory irritants, crouch, climb stairs or kneel, and occasionally stoop and twist. (R. 579-80). She concluded that Plaintiff had significant limitations in manual maneuvers due to his neuropathy and that he would miss more than four workdays per month. (*Id.*).

On December 30, 2020, neurologist Daniel Birnbaum, D.O., noted that Plaintiff had been diagnosed with neuropathy in 2003 but that he was not currently taking medications for the condition because they had proven ineffective or were contraindicated by his history of kidney stones. (R. 893). Instead, Plaintiff reported using ice and "pour-on gels." (*Id.*). Plaintiff's limbs were painful to palpation, and he stated that he could not walk more than two blocks due to his neuropathy. (*Id.*). Plaintiff further stated that his neuropathy had been confirmed by a prior electromyography (EMG), but Dr. Birnbaum noted that an EMG from December 2004 indicated no peripheral neuropathy. (R. 893-94). Dr. Birnbaum reviewed Plaintiff's 2019 MRI but could not "find any major [evidence of] an osteo-degenerative processes that would suggest a specific etiology for his [low back pain]." (R. 894). As a follow up, Dr. Birnbaum ordered a new EMG. (*Id.*).

On January 6, 2021, medical consultative examiner David Dzurinko, M.D., completed an Internal Medicine Examination of Plaintiff. (R. 752-69). Plaintiff chiefly complained of anxiety, depression, panic, "socks and gloves neuropathy," lumbar spondylosis at L4-L5 disc, chronic back pain between seven and 10 on a scale of 10, ulcerative colitis, and acid reflux. (R. 752). His back pain required his wife to help him up in the morning. (*Id.*). He wore a back brace to the examination and reported using a scooter and wheelchair as needed. (R. 754). The neuropathy caused "significant numbness and tingling," and he was "severely affected with discomfort in the hands and feet," although his EMGs had been "somewhat equivocal." (R. 753). He was positive

for 11 of 18 trigger points, indicating possible fibromyalgia, for which he reported he had a diagnosis.  (R. 754).  The ulcerative colitis was intermittent but associated with chronic diarrhea and irritable bowel disease.  (R. 752-53).  Plaintiff also suffered from recurring kidney stones requiring removal and related procedures and dermatitis covering most of his torso.  (R. 753). He further reported lethargy, fatigue, fogginess, cognitive issues and a labral tear, but he had not undergone surgery.  (R. 753-54).

Plaintiff's self-reported ADLs included driving, personal care, watching television, listening to the radio and using social media.  (R. 755).  On examination, Plaintiff could squat three-quarters and walk on his toes but not his heels, used no assistive device, needed no help preparing for or participating in the examination, had a mildly antalgic gait, mild spinal deformity (scoliosis and kyphosis), sensory deficits in his hands and feet, full strength in his extremities and grip, and intact hand and finger dexterity.  (R. 756-58).  Dr. Dzurinko determined that Plaintiff had a guarded prognosis.  (R. 758).

In the attached Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Dzurinko opined that Plaintiff could never carry more than 20 pounds, lift more than 50 pounds, reach overhead with his left hand, climb ladders or scaffolds, stoop, kneel, crouch, crawl or tolerate exposure to unprotected heights and extreme cold; occasionally lift between 21 and 50 pounds, reach or push and pull with his left hand, feel with his hands or operate foot controls bilaterally, or climb stairs and ramps; he could frequently lift and carry up to 20 pounds, handle and finger with his left hand, balance, operate a motor vehicle or tolerate exposure to moving mechanical parts; and continuously engage in all maneuvers with his right hand except feeling and tolerate exposure to all other environmental factors.  (R. 760-64).  He further opined that in an eight-hour workday Plaintiff could sit for three to four hours without interruption and up to eight hours total, but only stand or walk for 10 to 15 minutes without

interruption and one to two hours total. (R. 761). He further noted that Plaintiff does not use a cane. (*Id.*).

On February 5, 2021, State agency medical consultant Crescenzo Guilio Calise, M.D., opined that Plaintiff could occasionally lift and carry up to 25 pounds and climb ladders, ropes, and scaffolds and frequently lift and carry up to 10 pounds, climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. 126-28). He concluded that Plaintiff could stand and walk or sit for six hours in an eight-hour workday and tolerate unlimited exposure to extreme heat, wetness, humidity, noise, and respiratory irritants, but that he must avoid concentrated exposure to hazards, vibration and extreme cold. (R. 127-28).

On May 11, 2021, Plaintiff sought a second opinion regarding his neuropathy from neurologist Anishee Undavia, M.D., who, like Dr. Birnbaum, also recommended that a new EMG be performed. (R. 896-97).

Plaintiff reported to primary care physician Frank Balloqui, M.D., on June 14, 2021, that his EMG was normal. (R. 890). However, he continued to suffer from neuropathy symptoms, as well as lower back pain. (*Id.*). Physical examination results from the visit were unremarkable. (R. 890-91). At this time Dr. Balloqui also completed a Physical RFC Assessment in which he noted Plaintiff's diagnoses for lumbar spondylosis, neuropathy and ulcerative colitis and opined that in an eight-hour workday he could sit for four hours and stand or walk less than two hours, that he would have to shift positions throughout the workday, and that he would occasionally need to take unscheduled breaks. (R. 864). He further opined that Plaintiff could never crouch, kneel, or lift or carry 10 pounds or more, or tolerate exposure to temperature extremes, humidity, or fumes, odors, and chemicals; rarely lift and carry up to 10 pounds, stoop, twist or tolerate exposure to dust and hazards; and occasionally climb stairs. (R. 865-66). He determined that Plaintiff had significant limitations with manipulations due to "difficulty grabbing" and that he

7

would be off-task one-quarter of the time or more and miss more than four days of work per month.  (*Id.*).

### 2.    Mental

On July 18, 2019, Andrew Lopez, M.D., of Merakey Mental Health Service in Philadelphia, Pennsylvania completed a psychiatric examination of Plaintiff.  (R. 594).  Plaintiff reported depression, anxiety and panic attacks without a trigger after his father and dog died over the last several months.  (*Id.*).  Upon examination, Plaintiff had a neat appearance, cooperative behavior, appropriate affect and perceptions, normal speech and thought, no evidence of impairment in concentration or attention, depressed mood, and above average intelligence.  (R. 596-97).  Dr. Lopez diagnosed depression, generalized anxiety disorder, bereavement and panic, prescribed Plaintiff Viibryd, continued him on Effexor, and referred him for individual therapy. (R. 598).  In August 2019, he reported fewer panic attacks since beginning medication.  (R. 631, 633).  Throughout the fall of 2019, Plaintiff continued to have marital difficulties, although he also reported enjoying a vacation with his wife.  (R. 635-46).  He reported that his diazepam was helpful during the trip.  (R. 719).  At the end of October 2019, Plaintiff mentioned contacting Dr. Lopez to change his medications because he believed they were making him tired and sleepy. (R. 641).  In a December 2019 visit, he reported increased depression due to the holidays causing him to think about his deceased father and dogs.  (R. 647).  However, later in the month he was "feeling better in mood" and his "anxiety level [was] much lower."  (R. 722).

In early March 2020, Plaintiff described having been unable to get out of bed the prior Saturday due to severe depression, although he was "feeling better" by the time of the appointment and looking forward to an upcoming trip to Florida with his wife.  (R. 666).  Dr. Lopez's medication management notes from the end of April 2020 state that Plaintiff had a low anxiety level and fewer panic attacks (weekly as opposed to thrice weekly), but he was still

struggling with low mood and was emotionally distraught and unable to focus after his second dog died. (R. 731). He complained of feeling "like a cripple" and being unable to "do anything" due to pain. (*Id.*). His mental status examination was noteworthy for a "neutral, depressed, anxious mood," although his memory remained intact and his attention, concentration, insight and judgment were "fair." (*Id.*). In his May 2020 therapy sessions, he often focused on his application for disability benefits and marital difficulties and reported that the problems in his marriage were contributing to his depression. (R. 676, 680). He began taking steroids and testosterone to increase his energy levels but did not experience any effects from them. (R. 680, 683). In June and July 2020, he remained "depressed about not having energy" and fixated on his marital problems. (R. 683, 687). He was "still feeling extreme fatigue" and experiencing "chronic depression," which was attributed to his physical problems, but was able to take care of his mother following her hip surgery. (R. 684, 691). However, adopting a new dog led him to hope that he would "find renewed purpose in life." (R. 691).

At a medication management appointment later in July, Plaintiff told Dr. Lopez that he had a low mood and lack of interest, which Plaintiff attributed to low testosterone. (R. 734). He also reported chronic pain, although his colitis was noted to be in remission at the time. (*Id.*). Upon examination, Plaintiff had a depressed and anxious mood with fair judgment, attention, concentration and insight. (*Id.*). By September 2020, he was feeling extreme fatigue with no energy and was depressed when he thought about his marital complications, although he also reported being happier in the company of his new dog. (R. 702). He also had increased anxiety and on certain mornings wakes up feeling "afraid." (R. 703). Early the following month, he had a lack of energy and was physically exhausted due to his neuropathy. (R. 704). He was often too tired to exercise, but still went on outings with his wife. (R. 704, 706). At his November 2020 medication management visit, it was noted that Plaintiff was suffering from depression,

anxiety and fear "most of the time at a mild level." (R. 737). His examination revealed a depressed and anxious mood and fair insight, judgment, attention, and concentration. (*Id.*). By the end of year, he was feeling depressed about his marital problems and fatigued due to his physical problems but was able to exercise. (R. 713, 715).

In January 2021, Plaintiff complained that his anxiety and depression were worsening and that his medications were not working, although his examination results were generally normal. (R. 1002). He stopped taking some of his medications—Viibryd and Venlafaxine—by the end of the month. (R. 1008). He missed three consecutive therapy sessions in January and February 2021. (R. 1231). He continued to experience marital difficulties in February and March 2021. (R. 1234-44). At the end of March, he reported having "good days and bad days" and was sometimes having difficulty getting out of bed due to his depression or anxiety, but he was also "socializing with friends to keep his mood up." (R. 1246). The following month his mood was improved due to positive developments regarding his vehicle, taxes and disability paperwork. (R. 1248). In May 2021, he complained that his anxiety was "not under control" and requested a different medication. (R. 1014). He also reported that his depression had increased and he was very anxious about his upcoming disability proceeding, although his anxiety dissipated once he started preparing for the proceeding. (R. 1255, 1261, 1263). In June 2021, he complained of debilitating mood swings and increased depression that made it difficult to care for himself. (R. 1021, 1267). At the end of the month, he was feeling "terrible," although he was able to socialize with friends at times and use social media. (R. 1269). He reported that his Effexor prescription had been doubled to help with his anxiety. (*Id.*). Mental examination results remained unchanged. (R. 1014-21).

On April 29, 2020, Dr. Lopez completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) in which he opined that Plaintiff had no or poor ability to deal with

the public or work stress, function independently, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and understand, remember, and carry out detailed or complex instructions; a fair ability to maintain personal appearance and understand, remember, and carry out simple instructions; and a good ability to follow work rules, relate to coworkers, interact with supervisors, and use judgment. (R. 859-61). Dr. Lopez elaborated: "Gary is able to follow work rules and is sociable. He is impaired in his concentration and persistence and follow through due to recurrent depressive symptoms, disabling anxiety and panic attacks and chronic pain." (R. 859). He predicted that Plaintiff would decompensate in a work setting due to stress; likely miss three or more workdays per month; have difficulty completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and frequently fail to complete tasks in a timely manner due to his deficiencies in concentration, persistence, or pace. (R. 862).

On July 28, 2020, State agency psychological consultant Dante Emmanuel Mancini, Ph.D., opined that Plaintiff had mild limitations in interacting with others and in concentrating, persisting or maintaining pace but no other significant limitations. (R. 109).

On January 6, 2021, psychological consultative examiner Kristen Mulray, completed a Mental Status Examination of Plaintiff. (R. 740-51). Plaintiff reported that he attended regular education classes in school, graduated and earned an associate degree afterward. (R. 740). He stated that he has difficulty falling asleep but that once he does, he may sleep "for days at a time." (R. 741). He reported depressive symptoms including dysphoric moods, crying spells, hopelessness, loss of interest, irritability, feelings of worthlessness, diminished self-esteem, concentration difficulties, anhedonia, social withdrawal and a passive death wish. (*Id.*). He reported anxiety symptoms including excessive worry, irritability and difficulty concentrating.

(*Id.*).  He reported cognitive symptoms and deficits including difficulty learning new material, organization difficulties, short-term memory deficits, planning difficulties, and sequencing difficulties.  (R. 742).  He also had random panic attacks at least once or twice per month, with sweating, breathing difficulties, fear of dying, chest pain and choking sensation.  (*Id.*).  His mental examination was noteworthy for depressed affect and dysthymic mood, but he had good insight and judgment, average cognitive functioning, and intact memory and concentration with the ability to recall objects, repeat digits forward and backward, count (including by serial sevens), and complete simple calculations.  (R. 743).  His ADLs included personal care, driving (although his wife handles most of it), socializing with his wife, using social media, spending time with his dogs, watching television, and listening to music.  (R. 743-44).  His prognosis was assessed as fair, given his recurrent depressive symptoms.  (R. 744).

In the attached Medical Source Statement of Ability to Do Work-Related Activities (Mental), Mulray opined that Plaintiff had mild limitations in his ability: to understand, remember and carry out complex instructions; to make judgments on complex work-related decisions; and to interact appropriately with coworkers and supervisors; as well as moderate limitations in his ability to respond to usual work situations or changes in a routine work setting. (R. 745-46).

On January 12, 2021, State agency psychological consultant Karen Louise Plowman, opined that Plaintiff had a mild limitation in concentrating, persisting or maintaining pace but no other significant limitations.  (R. 123).

On April 7, 2021, Alexander Pavlo, L.S.W., wrote a letter stating that Plaintiff has been attending weekly individual therapy sessions at Merakey to manage his depression, anxiety and panic attacks and seeing a psychiatrist every two to three months for medication management. (R. 879).  He indicated that due to Plaintiff's depression he struggles with low energy, fatigue,

oversleeping, and low motivation.  (*Id.*).

### B.    Non-Medical Evidence

The record also contains non-medical evidence.  In an Adult Function Report dated July 12, 2020, Plaintiff claimed that his ADLs consist primarily of sleeping most of the day, although he also helps to care for and shop for his elderly mother, helps to feed his and his wife's two dogs, engages in personal care without problems but with reminders from his wife, cooks weekly, makes sandwiches, takes out the trash, walks, drives (including alone), rides in a car as a passenger, bicycles, manages money, watches television, listens to music, socializes on social media and the telephone, and visits "some places in Wildwood, [New Jersey]."  (R. 268-72).  He endorsed difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentrating and using his hands.  (R. 273).  He indicated that he cannot walk "far" and that he was "not sure" how long he can pay attention or how well he could follow written instructions or get along well with authority figures.  (*Id.*).  He reported that he does not handle stress or changes in routine well.  (R. 274).  In the attached Supplemental Function Questionnaire, he identified constant, increasing, radiating, sharp, stabbing, throbbing and burning pain in his lower back, hands, and feet.  (R. 277).  Plaintiff's wife also completed a Third-Party Adult Function Report in which she identified largely the same ADLs and difficulties identified by Plaintiff.  (R. 286-93).

At an August 9, 2021, administrative hearing, Plaintiff testified that he stopped working in his position as a nightclub manager due to worsening pain, depression and anxiety.  (R. 81-82).  His physicians have attributed the cause of his depression primarily to physical pain, but Plaintiff believes that "it goes beyond that."  (R. 96).  He is unable to focus due to depression.  (*Id.*).  He has back problems and chronic foot and hand pain due to neuropathy.  (R. 85-88).  He described the foot pain as "stabbing" and the hand pain "like[] punching steel."  (R. 93).  He also

has a "slight tremor" that affects his grip. (R. 93-94). He has acid reflux and ulcerative colitis, which causes bloating, abdominal pain and diarrhea, and he takes medication for both conditions. (R. 90). Plaintiff has had six surgeries for kidney stones. (R. 94). He experiences panic attacks with racing heartbeat and light-headedness that sometimes cause him to pass out, including a recent incident resulting in an emergency room visit after he cut his head when he fell. (R. 91-93). He spends most of his time sleeping, although he also visits his mother weekly in Wildwood Crest, New Jersey, spends time with his dogs and talks with his brother and niece, apparently on the telephone. (R. 83-84). He can only sit for a few hours, wears a back brace and uses a cane or motorized scooter as needed. (R. 88-89).

After remand, the ALJ held another administrative hearing on August 26, 2024. Plaintiff's condition was essentially unchanged, and he was still regularly receiving treatment for his physical and mental health issues. (R. 1337). Plaintiff testified to his continuing symptoms of pain and depression. (R. 1338-44).

A VE also testified at the administrative hearing. (R. 1353-57). The VE testified that assuming an individual with: no past relevant work who was limited to light exertion level work; occasional posturals; no climbing of ladders, ropes, or scaffolds; no exposure to unprotected heights; no use of foot controls; no pushing or pulling with the lower extremities; occasional climbing of ramps and stairs; no kneeling or crawling; frequent reaching, handling, and fingering; occasional overhead reaching or lifting; a limitation to simple routine tasks and making simple decisions; occasionally tolerating changes in a workplace; and frequently tolerating interactions with coworkers, supervisors, and the public, significant jobs would be available in the national economy for that individual. (R. 1353). On cross-examination, the VE confirmed that the ALJ's proffered limitation to simple tasks would preclude an individual from carrying out and performing "detailed written or oral instructions." (R. 1356).

## III.    ALJ'S DECISION

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2021.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of September 1, 2020 through his date last insured of September 30, 2021 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: disorders of the spine, ulcerative colitis, neuropathy, obesity, fibromyalgia, depressive disorder, and panic disorder (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional posturals; no climbing of ladders/ropes/scaffolds; no exposure to unprotected heights; no use of foot controls; no pushing/pulling with the lower extremities; occasional climbing of ramps/stairs; no kneeling or crawling; frequent reaching, handling, and fingering; occasional overhead reaching/lifting; limited to simple routine tasks, making simple decisions, tolerating occasional changes in the workplace, and frequent interactions with coworkers, supervisors, and the public.

6.     The claimant has no past relevant work (20 CFR 404.1565).

7.     The claimant was born on September 5, 1970, and was 51 years old, which is defined as a younger individual age 18-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.     The claimant has at least a high school education (20 CFR 404.1564).

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from September 1, 2020, the alleged onset date, through September 30, 2021, the date last insured (20 CFR 404.1520(g)).

(R. 1307-24).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 1324).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, then the

> Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work.  If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited.  A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The court has plenary review of legal issues.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In his request for review, Plaintiff claims[2] that remand is required because:

> 1. The ALJ failed to adequately consider the factor of consistency in evaluating the medical opinion evidence; and
>
> 2. The ALJ failed to resolve a reasoning level conflict between the VE's testimony and the Dictionary of Occupational Titles (DOT).

(Pl.'s Br., ECF No. 6, at 3).[3]

### A.    The ALJ's "Consistency" Assessment of the Medical Opinions

#### 1.    The ALJ's Decision

The ALJ evaluated the medical opinions at issue in this claim as follows:

> Dr. Dzurinko opined in January 2021 that the claimant could lift/carry 20 pounds frequently. In an eight-hour day, he could sit eight hours, stand one to two hours, and walk one to two hours. He did not require the use of a cane to ambulate. . . . The claimant could not perform activities like shopping. He could not walk a block at a reasonable pace on rough or uneven surfaces. He could not use standard public transportation. He could not climb a few steps at a reasonable pace with the use of a single hand rail. The undersigned finds the opinion of Dr. Dzurinko is partially persuasive. Dr. Dzurinko did not specify any findings in support of his opinion. The undersigned agrees with some of the limitations opined by Dr. Dzurinko. However, the undersigned finds that Dr. Dzurinko overstates the degree to which the claimant is limited for standing, walking, stooping, and crouching. Upon examination by Dr. Dzurinko, the claimant's stance was upright and normal. He had only a mildly antalgic gait and he did not use an assistive device; Dr. Dzurinko himself agreed that the claimant did not need a cane to ambulate. Squatting was 75 percent of full. Straight leg raising was negative bilaterally. Joints were stable and there was no tenderness or heat. DTRs were physiologic and equal. Strength was 5/5 in the lower extremities. There was no muscle atrophy. In the lumbar

---

[2]  The Court sets forth and considers Plaintiff's arguments in the order corresponding to the five-step sequential analysis.

[3]  Plaintiff also raises a third, related but separate claim that the Commissioner cannot invoke SSA Emergency Message 21065 to support the ALJ's decision.  (Pl.'s Br. ECF No. 6, at 3).  However, in his response the Commissioner disavows any intention to do so.  (Resp., ECF No. 7, at 10).  For this reason, the Court does not further consider this related claim.

spine, flexion-extension was only slightly reduced to 70 out of 90 degrees, but lateral flexion was normal and ranges of motion in the lower extremities were normal. Those findings are consistent with an ability to stand/walk a total of six hours in an eight-hour workday, as well as occasionally stoop and crouch.

\*\*\*

The State agency medical consultant, Dr. Crescenzo Giulio Calise, opined in February 2021 that the claimant could lift/carry 25 pounds occasionally and 10 pounds frequently. He could stand/walk six hours and sit about six hours total in an eight-hour workday. . . . The undersigned finds the opinion of Dr. Calise is partially persuasive. In support of his opinion, he referenced the results of Dr. Dzurinko's evaluation. Although the undersigned finds that the record is consistent with lifting/carrying no more than 20 pounds occasionally . . ., overall the opinion of Dr. Calise indicates an ability to perform range of light work. . . . The claimant did not use an assistive device and his gait was actually noted to be normal even after the expiration of his insured status. Although Dr. Dzurinko noted sensory deficits, subsequent examinations by neurology and pain management in May and June 2021, respectively, showed that sensory/sensation was intact.

\*\*\*

The claimant's [primary care provider (PCP)], Dr. Frank Balloqui, opined in June 2021 that the claimant could sit about four hours and stand/walk less than two hours in an eight-hour workday. He needed to shift positions at will and take unscheduled breaks. He could rarely lift/carry less than 10 pounds. . . . The undersigned finds the opinion of Dr. Balloqui is not persuasive. He did not specify any findings in support of his opinion, noting diagnoses only: lumbar spondylosis, neuropathy, and ulcerative colitis. The undersigned finds that Dr. Balloqui generally overstates the degree to which the claimant is limited. Treatment notes by Dr. Balloqui on the day he rendered his opinion show that the claimant had presented to have disability paperwork completed and he reported ongoing symptoms of low back pain and neuropathy. Dr. Balloqui commented that the claimant had had EMG studies done, which the claimant reported were normal overall. . . . No musculoskeletal or neurological findings were noted and the remainder of the examination was unremarkable. The most recent musculoskeletal and neurological findings by Dr. Balloqui prior to the June exam were from April 7, 2021. At that time, Dr. Balloqui noted only that the claimant had normal mobility/gait and did not require an assistive device. . . . Except for a BMI of 35, clinical findings were otherwise unremarkable. The objective findings by Dr. Balloqui are consistent

with an ability to perform a range of light work and do not support the extreme limitations opined by him in June 2021.

. . . .

The undersigned acknowledges that there is a medical opinion dated June 2020, prior to the alleged onset date, by Dr. Helen Volokhonsky, the claimant's PCP. She opined that the claimant could sit about two hours and stand/walk less than two hours in an eight-hour workday. He needed to shift positions at will and take unscheduled breaks. . . . The undersigned finds the opinion of Dr. Volokhonsky is not persuasive. In support of her opinion, she stated that the claimant had chronic back pain and peripheral neuropathy for several years. He was following orthopedics and had received radiofrequency ablations. He had chronic numbness and tingling in his hands and feet secondary to neuropathy. The undersigned notes that the radiofrequency ablations to which Dr. Volokhonsky refers occurred in January 2019, more than a year and a half before the alleged onset date. In fact, Dr. Volokhonosky's most recent notes prior to her opinion, from April 29, 2020, show that she had a televisit only. The claimant complained of lower back pain and neuropathic symptoms in his feet, but Dr. Volokhonsky acknowledged that no physical exam was performed. The last time Dr. Volokhonsky actually appears to have examined the claimant prior to rendering her opinion was on November 26, 2019, nearly 10 months before the alleged onset date, at which time the claimant had a BMI of 30, but clinical findings were otherwise unremarkable. Those findings are not consistent with the extreme limitations opined by her. Dr. Volokhonosky's opinion relies on older evidence as well as the claimant's subjective complaints. Since remand, the claimant amended the alleged onset date. Dr. Volokhonosky's opinion was rendered nearly three months earlier and, given the lack of accompanying objective findings, does not shed light on the claimant's functioning during the period at issue.

(R. 1317-21 (record citations omitted)).

## 2.    The Parties' Positions

Plaintiff acknowledges that on remand the ALJ complied with this Court's earlier order directing her to reevaluate the medical opinions of Drs. Volokhonsky, Balloqui, and Dzurinko and explain the evidence supporting her evaluation of those opinions. (Pl.'s Br., ECF No. 6, at 19). However, Plaintiff argues that the ALJ still erred in her evaluation of these opinions as she failed to evaluate or explain the "consistency" of these opinions with each other or the rest of the

medical record, specifically with respect to Plaintiff's ability to stand or walk throughout the workday.  (*Id.* at 19-20).

Plaintiff notes that the three opinions were consistent with one another in finding that Plaintiff was unable to perform the necessary standing and walking required to perform light work.  (*Id.* at 20).  Though their findings were not identical, each doctor found that Plaintiff could sit, stand, or walk for at most no more than four hours in a workday.  (*Id.*).  Nevertheless, the ALJ "did not acknowledge that these opinions were consistent with one another in their agreement that [Plaintiff] could not" meet the minimum standard for standing and/or walking necessary for light work.  (*Id.*; *see also* SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983) (noting that light work involves standing or walking for a total of approximately six hours in an eight-hour workday)).  In addition, Plaintiff highlights other record evidence that he claims is consistent with the opinions of the three doctors, including his own statements that he: had consistent, debilitating back pain; required a cane to ambulate; utilized a motorized scooter when he left the house; occasionally used a back brace; and was unable to walk for more than two blocks.  (*Id.* at 21).  Ultimately, Plaintiff contends that the ALJ's failure to consider the consistency of this evidence was reversible error.  (*Id.* at 22).

The Commissioner responds that although ALJs must consider consistency when evaluating medical opinion evidence, they need not note each consistency between medical opinions.  (Resp., ECF No. 7, at 11 (citing *Nelson v. Kijakazi*, No. 21-186, 2022 WL 504578, at *1 n.3 (W.D. Pa. Feb. 18, 2022))).  Moreover, the Commissioner notes that consistency between opinions does not necessarily render them persuasive.  (*Id.* (citing *Marencic v. Comm'r of Soc. Sec.*, No. 3:18-CV-1863, 2020 WL 879410, at *9 (M.D. Pa. Jan. 27, 2020))).  Here, the Commissioner contends that the ALJ complied with all applicable regulations when evaluating the medical opinions and that her fact-finding was supported by substantial evidence.  (*Id.*).  In

support of the ALJ's RFC determination, the Commissioner points to record evidence that was consistent with that determination, including: Plaintiff's routine and limited treatment history; medical notes from the record indicating that Plaintiff exhibited a normal gait with no assistive device at times; and the medical findings of Dr. Calise, who found that Plaintiff could stand and/or walk for up to six hours in a workday.  (*Id.* at 12 (citing R. 127, 886-87, 1314-15, 1317-19)).

### 3.    Analysis

This Court agrees with the Commissioner that the ALJ complied with the regulations in evaluating the medical opinions referenced by Plaintiff.  "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). Supportability and consistency are the most important factors an ALJ must consider when evaluating the persuasiveness of medical opinions.  *Id.* at §§ 404.1520c(b)(2), 416.920c(c)(2). An ALJ is required to "explain how [she] considered" these factors.  *Id.* at §§ 404.1520c(b)(2), 416.920c(c)(2).  However, "the regulations do not mandate that the ALJ discuss the consistency between *specific* medical source opinions."  *Keilman v. King*, No. 23-161-J, 2025 WL 373649, at *1 n.2 (W.D. Pa. Feb. 3, 2025) (emphasis added); *see also Nelson v. Kijakazi*, No. 21-186, 2022 WL 504578, at *1 n.3 (W.D. Pa. Feb. 18, 2022) ("Plaintiff has argued that the ALJ overlooked consistencies among the medical opinions that were afforded little weight.  But while consistency is a factor ALJs consider in their evaluation of medical opinion evidence, they are not specifically required to catalogue consistencies between medical opinions in their decisions.") (citing 20 C.F.R. § 416.927(c)(4)).

Here, the ALJ adequately explained the weight she assigned the medical opinions in evidence by reference to various factors.  In rejecting Dr. Dzurinko's opinion regarding

Plaintiff's ability to stand, walk, or sit over the course of a workday, the ALJ highlighted the opinion of Dr. Calise, who opined that Plaintiff could: lift/carry 25 pounds occasionally and 10 pounds frequently; stand/walk up to six hours in a workday; and sit roughly six hours in a workday. (R. 1318 (citing R. 113-33)). In coming to this conclusion, Dr. Calise noted: Plaintiff had only a mildly antalgic gait; Plaintiff could walk on his toes for several steps and had a 75% full squat; his stance was upright and normal; Plaintiff was not utilizing an assistive device; he needed no help getting on and off the exam table and was able to rise from his chair without difficulty; a straight leg raise test was negative both seated and supine; Plaintiff's joints were stable and not deformed; strength was 5/5 in lower extremities proximal and distal bilateral; Plaintiff's ADLs "suggest[] he has the ability to care for himself and maintain his home"; Plaintiff's treatment had been essentially routine, consistent, and conservative; the medical records illustrated that Plaintiff's prescribed medications had been relatively effective in controlling his symptoms; and none of Plaintiff's impairments appeared to have gotten worse over the course of treatment. (R. 129-30).

"State agency medical . . . consultants are highly qualified and experts in Social Security disability evaluation," and an ALJ is entitled to rely upon their opinion to determine a claimant's RFC. *Brunson v. Comm'r of Soc. Sec.*, 704 Fed. App'x 56, 60 n.5 (3d Cir. 2017) (citing 20 C.F.R. §§ 404.1513a(b)(1), 404.1527(e)(2)(i)). Additionally, the ALJ separately highlighted evidence from Plaintiff's medical notes, including notes indicating Plaintiff did not use an assistive device, had normal gait, and demonstrated intact sensation. (R. 1318-19 (citing R. 113-33, 752-74, 893-903, 2200-25)). The ALJ's explanation that Dr. Dzurinko's opinion was not consistent with Dr. Calise's opinion nor the other record evidence was therefore supported by substantial evidence, and the ALJ adequately explained her rationale. Because the ALJ need not follow a particular format or formula in their analyses, *Jones v. Barnhart*, 364 F.3d 501, 504-05 (3d Cir. 2004), the

Court finds nothing further was required.

Next, in rejecting the June 2021 opinion of Dr. Balloqui, the ALJ noted that Dr. Balloqui's opinion was not well-supported by his own treatment notes for various reasons.  (R. 1319).  She highlighted that Dr. Balloqui: did not specify any findings to support his opinion, noting only Plaintiff's various diagnoses; "overstate[d] the degree to which [Plaintiff] was limited"; acknowledged that Plaintiff's EMG results were normal overall; noted upon examination that Plaintiff did not present with any neurological or musculoskeletal abnormalities; and noted at a prior exam in April 2021 that Plaintiff had normal mobility and gait and did not require an assistive device.  (*Id.* (citing R. 864-67, 890-91)).  Ultimately, the ALJ found that "[t]he objective findings by Dr. Balloqui are consistent with an ability to perform a range of light work and do not support the extreme limitations opined by him in June 2021."  (*Id.*).

Again, this discussion illustrates that the ALJ considered the consistency of Dr. Balloqui's opinion with other record evidence and ultimately rejected his findings.  The ALJ found that Dr. Balloqui's own findings were inconsistent with his sit/stand/walk limitation, and referenced other record evidence—including the EMG studies—with which the opinion was inconsistent. Moreover, when read in context, it is clear that the ALJ also weighed the opinions of Drs. Calise and Balloqui against each other on the issue of a sit/stand/walk limitation and ultimately accepted Dr. Calise's opinion.  *Cf. Packard v. Astrue*, No. 11-7323, 2012 WL 4717890, at *3 (E.D. Pa. Oct. 4, 2012) ("When read in context, this Court has no trouble discerning a clear and satisfactory explication for why the ALJ chose to discredit [the claimant's] low GAF scores. . . . Since the ALJ's basis for discrediting the low GAF scores is readily discernible, a remand 'solely so the ALJ can insert the GAF scores into his decision' would amount to the kind of pointless 'ping-pong game' that judicial review of agency action should avoid.") (quoting *Coy v. Astrue*, No. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009)).  Here, within the same section

of the ALJ's opinion, she ultimately accepted Dr. Calise's opinion regarding Plaintiff's ability to sit, stand, and walk, thereafter incorporating those findings into the RFC determination.

Finally, in rejecting Dr. Volokhonsky's June 2020 opinion, the ALJ noted that Dr. Volokhonsky relied on older evidence, and that the last time Dr. Volokhonsky physically examined Plaintiff in November 2019, her clinical findings were largely unremarkable.  (R. 1320 (citing R. 509, 512)).  The ALJ ultimately rejected the opinion "given the lack of accompanying objective findings" supporting it.  (*Id.*).

Here again, the ALJ's findings were supported by substantial evidence, and read in context, it is clear that the ALJ credited the opinion of Dr. Calise and discredited Dr. Volokhonsky regarding Plaintiff's ability to sit, stand, and walk during the course of an eight-hour workday.  Though the ALJ did not expressly note that she was juxtaposing the two opinions, it is evident, based upon her RFC determination, that she weighed the two against each other, ultimately finding that Dr. Calise's opinion was more persuasive.  Nothing about this was error.

For these reasons, the ALJ's decision to reject the opinions of Drs. Dzurinko, Balloqui, and Volokhonsky complied with the regulations, including the requirement that the ALJ address the consistency of each medical opinion with the rest of the record evidence.  Accordingly, the Court declines to remand this matter on this basis.

### B.    The Alleged Reasoning Level Conflict

#### 1.    The ALJ's Decision

Relevant to the instant claim, the ALJ determined that Plaintiff was capable of performing light work with limitations to: simple routine tasks; making simple decisions; tolerating occasional changes in the workplace; and frequent interactions with coworkers, supervisors, and the public.  (R. 1311).  The ALJ further determined that based on Plaintiff's RFC,

"there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed," including: Marker (167,000 jobs available in the national economy); Mail Clerk (12,000 jobs available in the national economy); and Inspector/Hand Packager (6,900 jobs available in the national economy). (R. 1323). The ALJ noted that the VE testified that these jobs had an SVP 2 level. (*Id.*). He further testified that his testimony was consistent with the DOT. (*Id.*).

### 2. The Parties' Positions

Plaintiff contends that the ALJ erred in her step five analysis when she found that he was not disabled because he could perform the three occupations noted above. (Pl.'s Br., ECF No. 6, at 4). He argues that "there is an unresolved conflict in the vocational evidence concerning all three occupations." (*Id.*). Citing to SSR 00-4p, 2000 WL 1898704, *1-4 (Dec. 4, 2000), Plaintiff maintains that "before an [ALJ] can rely on testimony from a [VE] to support a finding of non-disability, the [ALJ] must identify, address, and explain the resolution of any apparent conflicts between the testimony of the [VE] and the contents of the DOT." (*Id.*). Plaintiff maintains that SSR 00-4p, in conjunction with the June 2024 *Vocational Expert Handbook*, requires the ALJ to "ask the [VE] for a 'reasonable explanation' for the difference between the [VE's] testimony and the DOT." (*Id.* at 4-5).

Here, the alleged conflict identified by Plaintiff involves the reasoning level requirements of the three jobs identified by the VE: Marker and Inspector/Hand Packager, which each have a GED reasoning level of 2; and Mail Clerk, which has a reasoning level of 3. (*Id.* at 6-7 (citing DOT # 209.687-026, # 209.587-034, # 559.687-074)). Plaintiff notes that a reasoning level 2 occupation requires that an individual have the capacity to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions"; while a reasoning level 3 occupation requires that an individual have the capacity to "[a]pply commonsense understanding

26

to carry out instructions furnished in written, oral, or diagrammatic form," and "[d]eal with problems involving several concrete variables in or from standardized situations." (*Id.* at 6 (citing Appendix C: General Education Development, DOT, 1991 WL 688702 (Jan. 1, 2016))). Plaintiff then highlights that the ALJ found that Plaintiff was limited to carrying out simple, routine tasks and making simple decisions. (*Id.* at 7 (citing R. 1311, 1353)). Plaintiff emphasizes the VE's testimony on cross-examination that "the ALJ's limitation to simple tasks would preclude the ability to carry out and perform detailed written or oral instructions." (*Id.* at 7-8 (citing R. 1356)). According to Plaintiff, the VE's testimony, combined with the ALJ's mental RFC finding, is incongruent with the conclusion that Plaintiff can perform the vocational requirements of any of the three jobs noted, as all three require the capacity to understand and carry out "detailed" instructions. (*Id.*). Plaintiff points generally to three prior cases from this Court, as well as several more federal district court opinions, to support his argument that the ALJ may not simply ignore the VE's testimony. (*Id.* at 8-9 (citing *Alvarado v. Colvin*, 147 F.Supp.3d 297 (E.D. Pa. 2015); *Upshur v. Colvin*, 200 F. Supp. 3d 503 (E.D. Pa. 2016); *Ellis v. Berryhill*, No. 17-5093, 2018 WL 6271578, at *7 (E.D. Pa. Nov. 30, 2018); *Michelle N. v. Kijakazi*, No. 22-10 (EP), 2022 WL 10048869, at *4 (D.N.J. Oct. 17, 2022); *Handwerk v. Kijakazi*, 692 F. Supp. 3d 458 (M.D. Pa. 2023); *Mitchell v. Berryhill*, No. 17 C 6241, 2019 WL 426149, at *5 (N.D. Ill. Feb. 4, 2019))).

Next, Plaintiff advances an ancillary argument specifically as to the Marker occupation. Plaintiff contends that this position "has not existed for many years." (*Id.* at 10). In support of this contention, he points to the description of this position in the DOT, which was last updated in 1977. (*Id.* at 10-11). He then notes a few federal district court opinions from other circuits which have concluded the occupation of Marker "likely" no longer exists in significant numbers in the national economy. (*Id.* (citing *Henderson v. O'Malley*, 21-CV-3304 (EK), 2024 WL

127843, *5 (E.D. N.Y. 2024) ("Given the prevalence of bar codes, PLU (price look-up) codes and

the like, it seems unlikely that significant numbers of price markers continue to wield pricing

guns or do similar work, in the nation's retail outlets in 2015 and 2016."); *Daniel L. v. Kijakazi*,

No. 22 C 6976, 2023 WL 5830807, *9 (N.D. Ill. 2023) (stating that the identification of over

100,000 Marker jobs in the modern economy was simply not credible and that the supposed

occupation of Marker generates wildly divergent job incidence numbers from VEs); *Hawthorne*

*v. Comm'r of Soc. Sec.*, No. 20-cv-0247-FB, 2021 WL 4356009, *2 (E.D. N.Y. 2021) (holding

that the occupation of marker is "plainly obsolete" as it no longer exists as "an isolated role" in

significant numbers in the modern economy); *Applefeld v. Comm'r of Soc. Sec.*, No. SAG-17-517,

2018 WL 1136571, *5, n.1 (D. Md. Mar. 1, 2018))).

      Plaintiff notes that if the Court were to eliminate Marker as a viable option, only 18,900

Mail Clerk and Inspector/Hand Packager jobs would remain.  (*Id.* at 11 (citing R. 1323)).

According to Plaintiff, remand is required on this basis alone because the ALJ did not

independently find that this number represents "a significant number of jobs in the national

economy."  (*Id.* (citing *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1317-19 (11th Cir. 2021));

*see also Sears v. Berryhill*, No. 17-0391 JB/KBM, 2018 WL 2002487, *9 (D.N.M. 2018)

(explaining that "a reasonable factfinder could conclude that 50,000 national jobs is not a

significant number")).

      The Commissioner responds by first arguing that Plaintiff forfeited his conflict argument

by failing to raise it at the administrative hearing.  (Resp., ECF No. 7, at 4 (citing *Vito R. v.*

*Bisignano*, No. 24-cv-6287, 2025 WL 1448208 (E.D. Pa. May 19, 2025) (finding the claimant

forfeited his challenge to an alleged conflict in the vocational expert's testimony where he failed

to raise the issue at the prior administrative hearing))).  The Commissioner contends that because

Plaintiff failed to object to the VE's testimony at the administrative hearing, he has forfeited any

claim that it conflicts with the DOT.  (*Id.*).

      In the alternative, the Commissioner argues that the VE's testimony constituted substantial evidence supporting the ALJ's step five determination, and Plaintiff's attempts to undermine the VE's testimony by manufacturing a conflict are unavailing.  (*Id.* at 5-10).  First, the Commissioner argues that Plaintiff is incorrect that a restriction to simple tasks conflicts with a job that has a reasoning level of 2.  (*Id.* at 5).  The Commissioner cites to the Third Circuit's opinion in *Money v. Barnhart* for the contention that "[w]orking at reasoning level 2 [does] not contradict the mandate that [a claimant's] work be simple, routine, and repetitive."  91 F. App'x 210, 215 (3d Cir. 2004).  Further, the Commissioner notes that no bright-line rule exists that a job that requires level 3 reasoning conflicts with a restriction to simple and routine work.  (*Id.* at 6 (citing *Zirnsak v. Colvin*, 777 F.3d 607, 618 (3d Cir. 2014))).  Instead, the Third Circuit has considered "a combination of factors" in evaluating whether a conflict exists between the DOT and either a VE's testimony or an ALJ's RFC finding, including: 1) whether the claimant argued that she was incapable of performing the reasoning level 3 jobs recommended by the VE and whether the record established that she could perform such jobs; 2) whether the claimant identified any inconsistencies between the VE's testimony and the DOT at the hearing; and 3) whether the VE identified the jobs as representative jobs.  (*Id.* (citing *Zirnsak*, 777 F.3d at 618)).  Applying these factors, the Commissioner argues that remand is not warranted.  (*Id.*).

      Regarding the first factor, the Commissioner maintains that: 1) Plaintiff fails to point to any evidence that he could not perform a job with a reasoning level of 3; and 2) the record evidence illustrates that Plaintiff is capable of doing so.  (*Id.*).  Regarding the second factor, though the Commissioner acknowledges that Plaintiff's counsel cross-examined the VE as to whether Plaintiff could perform the jobs identified based on the ALJ's proffered mental limitations and their reasoning levels, the Commissioner maintains that the cross-examination

was insufficient given that counsel did not fully represent the definition of reasoning level 2.  (*Id.* at 7-8 (citing *L.L. v. Comm'r of Soc. Sec.*, No. 24-CV-09 (EP), 2025 WL 491941, at *4 (D.N.J. Feb. 13, 2025))).  Specifically, though counsel confirmed with the VE that an individual with Plaintiff's mental limitations could not understand or carry out "detailed" oral and written instructions, he failed to ask the VE whether such an individual would be prevented from understanding or carrying out "detailed *but uninvolved* written or oral instructions."  (*Id.* (emphasis in original)).  According to the Commissioner, this modifier is material to the analysis here, as courts have held that individuals limited to simple routine tasks and making simple decisions still may be able to understand and carry out detailed but uninvolved instructions.  (*Id.* (citing *Lawrence v. Saul*, 941 F.3d 140, 143 n.8 (4th Cir. 2019); *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010); *Barlow-Ahsan v. Kijakazi*, No. 21-CV-02220-RAL, 2023 WL 6847559, at *9 (E.D. Pa. Oct. 17, 2023); *King v. Saul*, 787 F. App'x 170, 171 (4th Cir. 2019))).  Further, the Commissioner notes that "detailed but involved instructions are effectively synonymous with simple instructions; and there is no conflict between simple and uninvolved instructions, as both connote instructions that are not complicated or intricate."  (*Id.* at 8 (quoting *Lawrence*, 941 F.3d at 143 n.8) (cleaned up)).  Finally, regarding the third factor, the Commissioner notes that the VE did in fact identify the three jobs as representative jobs.  (*Id.* at 7 (citing R. 1353-54)).

Next, as to Plaintiff's contention that the occupation of Marker has become obsolete, the Commissioner cites to *Weeder v. Dudek*, a recent case from a sister district within Pennsylvania, which held the opposite.  (*Id.* at 10 (citing No. 24-cv-546, 2025 WL 848456, at *11 (M.D. Pa. Mar. 18, 2025) (rejecting an argument that marker and garment sorter jobs are "obsolete"))).  Because the VE testified that Marker was still an available occupation, and because Plaintiff did not submit any evidence to the contrary, the Commissioner maintains that substantial evidence supported the ALJ's step five conclusion that jobs were available in significant number in the

national economy that Plaintiff could perform.  (*Id.*).

Plaintiff replies that the administrative forfeiture rule the Commissioner advances does not actually exist.  (Reply, ECF No. 8, at 2).  He lays out several arguments for this conclusion, the most notable being that the *Zirnsak* court, which purportedly promulgated the rule, still analyzed the merits of the conflict issue notwithstanding any potential forfeiture.  (*Id.*).  In the alternative, Plaintiff contends that he has not, in fact, forfeited this issue as his counsel specifically cross-examined the VE on this issue, thereby highlighting it as a potential issue for the ALJ to rule on.  (*Id.* at 1).

Turning to the merits of his contention, Plaintiff emphasizes that his argument is not that a simple-tasks RFC conflicts with the DOT, but rather that the VE's testimony, specifically, creates the conflict he highlights.  (*Id.* at 6).  Plaintiff maintains that "detailed but uninvolved" instructions as set forth in the DOT are still "detailed" instructions—which Plaintiff cannot carry out, per the VE's testimony.  (*Id.* at 7-11).  In further support of his claim, Plaintiff highlights that the Commissioner has conceded in other cases that a limitation to simple tasks is incongruent with reasoning level 3 work.  (*Id.* at 11 (citing *Hohn v. Colvin*, 12-cv-38-GFK-FHM, 2013 WL 1196670, at *2 (N.D. Okla. Feb. 25, 2013))).  Plaintiff maintains that even if it is ultimately possible to square the VE's testimony and the ALJ's mental RFC finding with the DOT reasoning levels for the three jobs, the ALJ was nevertheless required to *address* the issue and explain how she resolved the potential conflict between the VE testimony and RFC finding, on the one hand, and the DOT reasoning levels, on the other.  (*Id.* at 6-7).  Because the ALJ here did not do so, any resolution of the testimony, the RFC finding, and the DOT would constitute impermissible post hoc rationalization, according to Plaintiff.  (*Id.* at 7).

### 3.    Analysis

I agree with Plaintiff that the ALJ's failure to resolve conflicts between the VE's

testimony and the DOT warrants remand of his case.[4]  "In step five of the disability inquiry, the

Commissioner bears the burden of establishing the existence of jobs in the national economy that

an individual with the claimant's impairments is capable of performing."  *Zirnsak*, 777 F.3d at

616 (citing 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560; *Kangas v. Bowen*, 823 F.2d 775, 777 (3d

Cir. 1987)).  "To determine what type of work (if any) a particular claimant is capable of

performing, the Commissioner uses a variety of sources of information, including the DOT, the

SSA's own regulatory policies and definitions (found in the Code of Federal Regulations

("CFR")), and testimony from VEs."  *Id.*

"To ensure consistency, courts have imposed an obligation on ALJs to '[i]dentify and

obtain a reasonable explanation for any conflicts between occupational evidence provided by

---

[4]  The Commissioner raises a threshold issue, arguing that Plaintiff failed to preserve this argument, as he did not adequately challenge the VE's testimony on cross-examination.  (Resp., ECF No. 7, at 4).  This contention is belied by the record.  Upon review of the transcript from the August 26, 2024, administrative hearing, Plaintiff's counsel adequately cross-examined the VE and raised the issue for the ALJ's consideration.

A claimant's failure to raise an alleged conflict between VE testimony and the DOT during the administrative hearing will result in forfeiture of that issue.  *See, e.g.*, *Christopher F. v. Kijakazi*, No. 1:21-cv-516, 2022 WL 9169835, at *17 (D.N.J. Oct. 14, 2022); *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) (the claimant "forfeited this argument [regarding a conflict in the VE's testimony] by failing to object . . . during the hearing"); *Dionisio R. v. Comm'r of Soc. Sec.*, No. 23-22067, 2025 WL 428557, at *5 (D.N.J. Feb. 7, 2025) ("Plaintiff did not object to the vocational expert's testimony on this basis at the administrative hearing, and thus his present challenge is untimely."); *Brown v. Comm'r of Soc. Sec.*, No. CV 19-2110, 2020 WL 1244186, at *5 (E.D. Pa. Mar. 16, 2020).

Here, Plaintiff did in fact raise this issue at the administrative hearing by specifically asking the VE whether a limitation to simple tasks would preclude the ability to "carry out and perform detailed written or oral instructions."  (R. 1356).  The VE replied in the affirmative.  (*Id.*).  Then, Plaintiff's counsel went further, clarifying with the VE that SVP and reasoning level metrics are "distinct aspects of the DOT."  (*Id.*).  Again, the VE replied in the affirmative.  Therefore, it was clear from the VE's testimony on cross-examination that there was an issue regarding the reasoning level requirements of the three occupations the VE highlighted, the VE's testimony, and Plaintiff's mental RFC.  This precise level of cross-examination has formerly been found sufficient to preserve the issue of a potential conflict.  *See Upshur*, 200 F. Supp. 3d at 513.

VEs . . . and information in the [DOT].'" *Zirnsak*, 777 F.3d at 617 (quoting SSR 00–4p, 2000 WL 1898704, at *1) (alterations in original). "Specifically, an ALJ is required to (1) ask, on the record, whether the VE's testimony is consistent with the DOT, (2) 'elicit a reasonable explanation' where an inconsistency does appear, and (3) explain in its decision 'how the conflict was resolved.'" *Id.* (quoting *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002)). "An ALJ's failure to comply with these requirements may warrant remand in a particular case." *Id.* "However, [the Third] Circuit has emphasized that the presence of inconsistencies does not mandate remand, so long as 'substantial evidence exists in other portions of the record that can form an appropriate basis to support the result.'" *Id.* (quoting *Rutherford*, 399 F.3d at 557).

Here, there is a conflict between the VE's testimony and the DOT, as the VE testified that: 1) an individual limited to simple, routine tasks and making simple decisions would not be able to perform occupations requiring the ability to carry out detailed written or oral instructions; and 2) such an individual could perform the occupations of Marker, Mail Clerk, and Hand Packer—even though each requires the ability to carry out detailed instructions, per the DOT. (R. 1353-56). The ALJ did not seek to clarify this conflicting testimony, nor did she address it in her opinion. (*See generally* R. 1301-31, 1353-58). Therefore, the ALJ failed to follow the requirements of SSR 00-4p.[5]

The Commissioner offers three arguments in opposition: 1) the RFC limitations determined by the ALJ, including limiting Plaintiff to performing only simple tasks, do not *per se* conflict with the ability to carry out detailed *but uninvolved* instructions; 2) the VE's

---

[5] As both parties note, though SSR 00-4p was replaced by SSR 24-3p, that policy ruling only became effective on January 6, 2025, and therefore is not applicable to the instant case. *See* SSR 24-3p: Titles II and XVI: Use of Occupational Information and Vocational Specialist and Vocational Expert Evidence in Disability Determinations and Decisions, Vol. 89, No. 235 Fed. Reg. 97,158-61 (Dec. 6, 2024).

testimony that such an individual would be precluded from carrying out "detailed" instructions

did not create a conflict with the reasoning level requirements for the three occupations noted, as

there is a material difference between "detailed" instructions and "detailed *but uninvolved*"

instructions; and 3) even if there is a conflict, substantial evidence supports the ALJ's ultimate

disability determination.  Each of these contentions fail for the following reasons.

First, though the Commissioner is correct that there is not a *per se* conflict between a

simple tasks limitation contained in an RFC finding and the ability to carry out detailed but

uninvolved instructions as set forth in the DOT definitions, *see, e.g.*, *Money*, 91 F. App'x at 215,

that is not Plaintiff's contention[6] or ultimately the relevant issue here.  Instead, the issue is

whether *the VE's testimony* conflicted with the DOT.

Second, moving to that testimony, it is clear from prior caselaw that it did in fact conflict

with the contents of the DOT.  *See Upshur*, 200 F. Supp. 3d at 511-14 (holding nearly identical

VE testimony elicited on cross-examination created a conflict with the DOT reasoning level

requirements).  The Commissioner attempts to distinguish this case from *Upshur* and others

holding similarly by arguing that "detailed but uninvolved" instructions are materially different

from "detailed" instructions.  (Resp., ECF No. 7, at 7-8).  Though several courts have

emphasized this distinction, they did so in the context of deciding that an *RFC determination*

limiting a claimant to performing only simple tasks did not conflict with the reasoning level 2

and 3 requirements contained in the DOT.  *See, e.g.*, *Money*, 91 F. App'x at 210; *Barlow-Ahsan*,

2023 WL 6847559, at *7-9; *Meloni v. Colvin*, 109 F. Supp. 3d 734, 741 (M.D. Pa. 2015); *Donna R.*

---

[6]  Plaintiff concedes that no such bright line rule exists.  (Reply, ECF No. 8, at 6).
Instead, Plaintiff focuses his claim on the testimony of the VE specifically, arguing that "[t]he
question before this Court is whether the ALJ could ignore conflicts in the vocational evidence
as to whether [Plaintiff] could perform the reasoning 2 and 3 level occupations adopted by the
ALJ with the limitations adopted by the ALJ."  (*Id.*).

*v. Kijakazi*, No. 1:20-cv-15449, 2022 WL 13009149, at *19-21 (D.N.J. Oct. 21, 2022) (collecting cases).  But again, that is not the issue here.  Instead, the issue centers around *the VE's testimony*.  And when similar VE testimony has been present in other cases, courts have predominantly held that a conflict existed.  *See Upshur*, 200 F. Supp. 3d at 511-14; *Alvarado v. Colvin*, 147 F. Supp. 3d 297 (E.D. Pa. 2015); *Ellis v. Berryhill*, No. 17-1593, 2018 WL 6271578 (E.D. Pa. No. 30, 2018); *Michelle N. v. Kijakazi*, No. 22-10 (EP), 2022 WL 10048869 (D.N.J. Oct. 17 2022); *Mitchell v. Berryhill*, No. 17 C 6241, 2019 WL 426149 (N.D. Ill. Feb. 4, 2019).[7]

Finally, the Commissioner relies heavily on *Zirnsak* to argue both that no conflict exists, or in the alternative that remand is not necessary based on the factors laid out in that case. (Resp., ECF No. 7, at 6-7 (citing *Zirnsak*, 777 F.3d at 618 (noting that the relevant factors include whether the claimant argued that she could not perform the reasoning level jobs the VE recommended and whether the record established that she could perform them; whether the claimant identified inconsistencies between the VE's testimony and the DOT at the hearing; and whether the VE identified the jobs as "representative"))).  But *Zirnsak* is distinguishable from the instant case, and ultimately the factors laid out in *Zirnsak* do not counsel affirmance in this case.

In contrast to the claimant in *Zirnsak*, Plaintiff brought attention to the inconsistency between the VE's testimony and the DOT on cross-examination, and he maintains that he is unable to perform the identified occupations given his mental limitations, which were formalized

---

[7]  The Court acknowledges that *L.L. v. Comm'r of Soc. Sec.*, cited by the Commissioner, directly contradicts the holding of *Upshur*.  No. 24-CV-09 (EP), 2025 WL 491941, *4 (D.N.J. Feb. 13, 2025) ("The Court takes note of Plaintiff's counsel's omission of the word 'uninvolved' when cross-examining the VEs about whether the RFC would 'preclude the ability to carry out detailed written and oral instructions.'  Nonetheless, whether counsel attempted to 'manufacture' a conflict is besides the point.  Ultimately, the question before the Court is whether an inconsistency exists between the DOT's definition of reasoning level 2 and the ALJ's limitation to 'simple, repetitive tasks.'  It does not.") (citations omitted).  Notwithstanding this fact, the weight of the caselaw in this area favors finding the existence of a conflict under these circumstances.  *See Alvarado*, 147 F. Supp. 3d at 297; *Ellis*, No. 17-1593, 2018 WL 6271578; *Michelle N.*, No. 22-10 (EP), 2022 WL 10048869; *Mitchell*, No. 17 C 6241, 2019 WL 426149.

in the ALJ's RFC determination. *Contra Zirnsak*, 777 F.3d at 618 ("[The claimant] does not

seriously argue that she is incapable of performing the jobs . . . recommended by the VE.").

Moreover, though the Commissioner points to certain evidence that might support the conclusion

that Plaintiff can, in fact, perform the identified occupations, it is not sufficient to warrant

affirmance given the existence of countervailing evidence in the record that would support

Plaintiff's contention that he cannot perform the requirements for the three jobs. *See Upshur*,

200 F. Supp. 3d at 512-14 (finding a conflict present, applying the *Zirnsak* factors, noting record

evidence that would both support and cut against the ALJ's disability determination, and

ultimately remanding "for further explanation as to whether there are jobs that plaintiff can

perform in the national economy").

        Arguing that substantial evidence supports the ALJ's finding that Plaintiff is not disabled,

the Commissioner points out that Plaintiff: received an associate's degree; previously worked as

a night club manager; performed ADLs during the relevant time period including shopping,

managing his own money, and caring for his grandmother; and had generally unremarkable

mental status examinations, including findings revealing that his memory remained intact and

that his attention, concentration, insight and judgment were "fair." (Resp., ECF No. 7, at 6-7; R.

271, 691, 731, 737, 740-43). While this evidence indeed weighs in favor of the conclusion that

Plaintiff has the ability to perform the job requirements, other record evidence cuts against this

conclusion. The record reveals that Plaintiff has struggled with various mental health issues over

the past several years, which resulted in the following symptoms manifesting at various times:

Plaintiff noted that he believed his medications (including diazepam) were making him feel tired

and sleepy; the inability to get out of bed some mornings due to severe depression; weekly panic

attacks; mild anxiety and fear; and debilitating mood swings and increased depression that made

it difficult to care for himself. (R. 641, 666, 731, 737, 1021, 1246). Further, the ALJ found that

Plaintiff had moderate limitations in concentrating, persisting, and maintaining pace and adapting or managing himself.  (R. 1310).

Though a reasonable factfinder might weigh the above evidence and ultimately conclude that notwithstanding the ALJ's RFC determination and the VE's testimony Plaintiff can still perform the requirements of the identified occupations, the ALJ did not make such a finding here.  Courts are not allowed to rely on after-the-fact justifications by the Commissioner to bolster an ALJ opinion that does not adequately deal with contrary evidence.  *See Fongsue v. Saul*, No. 20-574, 2020 WL 5849430, at *8 (E.D. Pa. 2020) ("[T]his court is constrained to review only the ALJ's reasoning, not the post hoc arguments propounded by Defendant after the ALJ's decision") (citing *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001)); *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *Teada v. Comm'r of Soc. Sec.*, No. 19-4537, 2020 WL 1953660, at *2-3 (E.D. Pa. 2020) (citations omitted).[8]

Therefore, the matter must be remanded on this basis for the ALJ to address the inconsistency created by the VE's testimony.[9]

---

[8]  The Court notes that after finding a conflict existed between the VE's testimony and the reasoning level requirements contained in the DOT, some of the cases surveyed failed to analyze the *Zirnsak* factors to determine whether remand was indeed warranted, instead just remanding on the presence of the VE testimony alone.  *See, e.g., Alvarado*, 147 F. Supp. 3d at 297; *Ellis*, No. 17-1593, 2018 WL 6271578; *Michelle N.*, No. 22-10 (EP), 2022 WL 10048869; *Mitchell*, No. 17 C 6241, 2019 WL 426149.  The Court finds the analysis in *Upshur* more appropriate, but ultimately determines that the factors do not militate against remand in this specific case.

[9]  Plaintiff also raises the ancillary argument that the occupation of Marker has become obsolete.  However, the Court need not decide whether this issue constitutes a basis for remand.  If on remand the ALJ resolves the above-referenced conflict by determining that Plaintiff cannot perform the occupations identified by the VE, then the VE may not identify the same (or any) occupations available to Plaintiff, thus rendering Plaintiff's remaining argument inapplicable.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **GRANTED** to the extent that it requests remand.  This matter is remanded for further proceedings consistent with this memorandum.


BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

---

*See Steinninger v. Barnhart*, No. 04-5383, 2005 WL 2077375, at \*4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because the ALJ may reverse his or her findings after remand).  Accordingly, the Court does not consider this additional argument at this time.